**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| JENNIFER CASE, REBECCA<br>CALLAHAN, PASTOR MARK<br>LIDDLE, PASTOR JIM NELSON,<br>DR. R.S. PORTER, SCOTT<br>FARR, AND BRUCE ERVIN | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. _____ |
| KAY IVEY, in her official capacity as<br> Governor of Alabama; Dr. SCOTT<br>HARRIS, in his individual capacity<br>And official capacity as State Health<br>Officer, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## **COMPLAINT**

COMES NOW the Plaintiffs, **Jennifer Case, Rebecca Callahan, Pastor Mark Liddle, Pastor Jim Nelson, Dr. R.S. Porter, Scott Farr, and Bruce Ervin** by and through their undersigned counsel, and bring this action under 42 U.S.C. § 1983 challenging the orders of Alabama Governor **Kay Ivey** and State Health Officer **Scott Harris** that have been issued from March 13 -- present concerning the COVID-19 pandemic.

## PARTIES

1. Jennifer Case is an individual over the age of nineteen (19) years, a resident of Madison County, Alabama, and has been residing in Madison County at all times relevant herein.

2. Rebecca Callahan is an individual over the age of nineteen (19) years, a resident of Shelby County, Alabama, and has been residing in Madison County at all times relevant herein.

3. Pastor Mark Liddle is an individual over the age of nineteen (19) years, a resident of Jefferson County, Alabama, and has been residing in

Jefferson County at all times relevant herein. Pastor Liddle is the pastor of Dominion Baptist Church located at 2333 Valleydale Road, Birmingham, AL 35244.

4.      Pastor Jim Nelson is an individual over the age of nineteen (19) years, a resident of Lawrence County, Alabama, and has been residing in Lawrence County at all times relevant herein. Pastor Nelson is the pastor of Church of the Living God located at 8384 Hwy. 157, Moulton, AL 35650.

5.      Dr. R.S. Porter is an individual over the age of nineteen (19) years, a resident citizen of Madison County, Alabama, and has been residing in Madison County at all times relevant herein.

6.      Scott Farr is an individual over the age of nineteen (19) years, a resident citizen of St. John's County, Florida and has been residing in St. John's County at all times relevant herein. Mr. Farr and Mr. Ervin own a business together in Shelby County, Alabama.

7.      Bruce Ervin is an individual over the age of nineteen (19) years, a resident of St Clair County, Alabama, and has been residing in St. Clair County at all times relevant herein. Mr. Ervin and Mr. Scott Farr own a business in Shelby County, Alabama

8. Defendant Kay Ivey is the Governor of the State of Alabama, resides in Montgomery, and at all relevant times has issued proclamations affecting the entire State of Alabama and all relevant jurisdictions herein.

9. Defendant Scott Harris is the State Health Officer who has, at all relevant times, been issuing orders that affect the entire State of Alabama and all relevant jurisdictions herein.

## FACTUAL BACKGROUND

10. Plaintiff Jennifer Case, like many in Alabama, has been denied her right to attend the church of her choice, and to exercise the mode of worship and articles of faith to which she is guaranteed by both the Constitution of Alabama and the 1st Amendment to the United States Constitution. *See Aff. of Jennifer Case, Ex. F.*

11. Plaintiff Case does not wear a facial covering because it caused her difficulty in breathing, headaches, sore throat, and also is a deprivation of her personal freedom to define and decide her own personal appearance in accord with her belief in God and His design for her life. *Id.*

12. Plaintiff Case has been denied admission to various stores, shops, and restaurants because of her failure to wear a mask and has suffered embarrassment, rejection, and ill will due to her failure to wear a facial covering. *Id.*

13. Plaintiff Rebecca Callahan drives a school bus for a school system which requires the wearing of a mask for all drivers in accord with orders of Defendants. Plaintiff Callahan does not have a medical exemption and considers that application for such an exemption would require release of personal and confidential information. *See Aff. of Shea Callahan, Ex. G.*

14. Plaintiff Callahan believes that wearing of a facial covering while in transport of small children is a danger to them and to her personally and deprives her of personal freedom to define her own appearance. *Id.*

15. Plaintiffs Mark Liddle and Jim Nelson are pastors in Alabama who have been denied their right to preach and conduct "in person" services at their respective churches and to conduct their services in a manner to which they are accustomed. *See Affs. of Pastor Mark Liddle, Ex. H, and Pastor Jim Nelson, Ex. I.*

16. Plaintiffs Liddle and Nelson maintain that the actions of Governor Kay Ivey and State Health Officer Scott Harris violate their rights of assembly, free speech, and religious liberty, and are in effect, a direct violation of the First Amendment to the United States Constitution. *Id.*

17. Plaintiff Dr. R.S. Porter operates a chiropractic business known as Functional Chiropractic in Madison County, Alabama. His treatment of patients who suffer severe pain from bodily injury, muscular pain, nerve damage and body abnormalities is essential to good health of his clientele. Treatments include body adjustments and relief of stress that causes headaches and pain.

3

18. Plaintiff Porter's business was severely damaged by the Defendants' actions and orders when patients cancelled and/or refused to keep appointments because of said orders and a requirement to wear facial coverings. *See Aff. of Dr. R.S. Porter, Ex. J.*

19. Plaintiff Porter's chiropractic business showed a steady growth in monthly income since 2014, but drastic decline in business after Defendants began issuing orders in March 2020. *Id.*

20. Plaintiff Porter further maintains that his property interest and family income were taken by the discriminatory and unfair mandate of the Defendants which affected his business.

21. Plaintiffs Scott Farr and Bruce Ervin operate a full service barber shop known as the Male Room in Shelby County, Alabama. Their business was closed by Dr. Harris's order of March 27, *Ex. A 18-19* which closed all barber shops. *See Aff. of Scott Farr, Ex. K, and Bruce Ervin, Ex L*

22. Plaintiffs Farr and Ervin maintain that there is no authority in the Governor or State Health Officer to close businesses in a discriminatory manner without a showing of public health concern relating to their business. Plaintiffs Farr and Ervin maintain that the Governor's actions and those of the State Health Officer were arbitrary, discriminatory, and an unjust seizure of their personal and real property in a violation of their rights under both the Fifth and Fourteenth Amendments to the United States Constitution and the Constitution of the State of Alabama.

23. Plaintiffs Farr and Ervin have received citations from the City of Hoover because of their refusal to remain closed as ordered by the Defendants. *Id.*

24. The Male Room was not declared to be unsafe or to have unsanitary conditions; nor was it declared that a virus was ever present in their facility. Under § 31-9-8 Plaintiffs Farr and Ervin have suffered a loss of property without due process, and have suffered damages.

25. Following the orders of Defendants Governor Kay Ivey and State Health Officer Scott Harris, mayors, commissioners, and other public officials have chosen to declare their own restrictions, mandates, and regulations without

any statutory authority. *Ex. B.* Some of these orders are even more restrictive than those issued by the Defendants. *Ex C.*

26. Not readily apparent but perhaps most egregious is that our children are being taught an unconstitutional and tyrannical form of government wherein laws are made by individuals and not legislative bodies, due process is ignored, and vague, arbitrary and meaningless edicts have become our rule of law.

27. On March 13, 2020, Governor Kay Ivey declared a state of emergency for the State of Alabama due to a coronavirus which originated in Wuhan, China, and was eventually brought to Alabama and was here perceived to be a serious threat to the health, safety, and welfare of the general public.

28. From that date to the present, Governor Ivey and State Health Officer Dr. Scott Harris have issued not less than 20 orders, proclamations, directives, and mandates which affect the entire State of Alabama and/or specifically referenced municipalities, jurisdictions, counties, and areas of this State as shown in: Exhibit A- Proclamations and Orders of Governor Kay Ivey and State Health Officer Scott Harris in chronological order.

29. Orders, decrees, proclamations, and other edicts have unlawfully restricted rights of worship, assembly, travel and other personal freedoms and liberties secured by both our Federal Constitution and the Constitution of the State of Alabama.

30. The wearing of facial masks, social distancing, quarantine of otherwise healthy individuals by stay-at-home orders, discriminatory closure of businesses, and other mandates have been enforced by threats of fines, incarceration, loss of business license, and other penalties without any involvement of laws made by elected members of the legislature of Alabama.

31. Emergency orders set to expire by law have been arbitrarily continued without any oversight of Alabama lawmakers despite the fact that over 5 months have passed since the "emergency" was declared by the Governor.

32. Our economy has been decimated; jobs have been irretrievably lost; unemployment is at record highs; schools have been disrupted; medical services have been delayed; churches, restaurants, and many businesses have been closed; and the morale of the public has been adversely affected. *Ex. A 33.1.*

33. On July 15, 2020, Dr. Scott Harris, State Health Officer, issued a statewide order requiring each person in the State of Alabama to wear a mask or facial covering "at all times when within six feet of a person from another household in any of the following places: an indoor space open to the general public, a vehicle operated by a transportation service, or an outdoor public space where ten or more people are gathered." This rule is subject to several exceptions. A copy of this order is attached as *Ex. A 69-79.*

34. On July 15, 2020, Governor Ivey issued a proclamation adopting Dr. Harris's order and requiring law enforcement to enforce it, subjecting anyone who violates the order to a penalty of $500 or imprisonment in the county jail. A copy of this proclamation is attached as *Ex. A 67.*

35. Public officials cannot make laws, regulations, or mandates to which they are exempt. By specifying "an indoor space open to the general public" the Governor and State Health Officer exempted themselves and other government employees from the requirement to wear masks because most government offices are not open to the general public.

36. On July 29, 2020, Dr. Harris amended his mask order, extending the duration until August 31, 2020. A copy of this order is attached as *Ex. A 82-92.*

37. On May 8, 2020, Governor Ivey issued a proclamation that renewed the state of emergency without calling the Legislature back for a special session. *Ex. 33.2.* On June 30, 2020, Governor Ivey issued another proclamation that seemed to acknowledge that Dr. Harris's authority to issue orders had expired, and therefore she adopted his orders as her own. *Ex. A 53.*

38. On March 27, 2020, Dr. Harris issued an order that: (1) prohibited gatherings of 10 or more, or of any size where the people could not maintain a constant 6-foot distance from each other, and (2) required some businesses to close while allowing others to remain open. *Ex. A 18-19.* On April 10,

2020, Dr. Harris issued a "Stay at Home Order," which allowed churches to meet but only if (1) less than 10 people were in the building, or (2) the church held "drive-in" services. *Ex. A 24-25.*

## JURISDICTION AND VENUE

39. This Court has jurisdiction under 28 U.S.C. § 1331 over the claims arising under the Constitution.

40. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the state-law claims because they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

41. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events ... giving rise to the claim occurred" in the Northern District of Alabama.

## COUNT I – VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT

42. Plaintiff reiterates and adopts each and every allegation in the preceding paragraphs numbered 1 through 41.

43. The Orders, Proclamations, and Mandates of both Governor Ivey and State Health Officer Harris are not laws as will be shown in Court VII in that they are *ultra vires* and actually refute the law of Alabama. Nevertheless, even if they were assumed to be laws, they would violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

### A. The Due Process Clause's Framework

44. The Due Process Clause of the Fourteenth Amendment states, "[N]or shall any state deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.

45. The Fourteenth Amendment's Due Process Clause protects the people from government mandates that are vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined... The Supreme Court has identified three values driving the vagueness doctrine. First, vague laws may trap the innocent by not providing fair warning.... Moreover, vague laws impermissibly delegate policy decisions to police, judges, and juries, which risks arbitrary and discriminatory application.... As a result, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Pine v. City of West Palm Beach, Fla.*, 762 F.2d 1262, 1275 (11th Cir. 2014) (citations, alterations, and quotation marks omitted).

46. As early as 1819, the Supreme Court held that the Due Process Clause was intended to protect the people from arbitrary government power. *See Bank of Columbia v. Okely*, 17 U.S. (4 Wheat.) 122, 126 (1819) ("As to the words from Magna Charta, incorporated into the constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice."); *see also Daniels v. Williams*, 474 U.S. 327, 331-32 (1986).

47. The Supreme Court has held that "the Due Process Clause, like its forebear in the Magna Carta ... was intended to secure the individual from the arbitrary exercise of the powers of government[.]" *Daniels*, 474 U.S. at 331 (quotation marks omitted).

48. "The touchstone of due process is protection of the individual against arbitrary action of government." *Dent v. West Virginia*, 129 U. S. 114, 123 (1889).

49. "By requiring the government to follow appropriate procedures when its agents decide to 'deprive any person of life, liberty, or property,' the Due Process Clause promotes fairness in such decisions. And by barring certain government actions regardless of the fairness of the procedures used to implement them ... it serves to prevent governmental power from being 'used for purposes of oppression[.]'" *Daniels*, 474 U.S. at 331.

50. The Due Process Clause's prohibition of vagueness and arbitrary conduct are often related, because vague laws often allow the government to enforce them in an arbitrary way. *See Beckles v. United States*, 137 S.Ct. 886, 894 (2017) ("An unconstitutionally vague law invites arbitrary enforcement in this sense if it leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case") (citations and quotation marks omitted).

## B. The Mask Order

51. In the subsections below, Governor Ivey's Proclamations and Dr. Harris's Orders will be examined under the framework outlined above. However, since the mask order was promulgated under both the authority of the Governor and the authority of Dr. Harris, Plaintiffs will examine the validity of the mask order here before moving on to the other directives from Governor Ivey and Dr. Harris.

52. The mask order requires each person to "wear a mask or other facial covering that covers his or her nostrils and mouth at all times when within six feet of a person from another household in any of the following places: an indoor space open to the general public, a vehicle operated by a transportation service, or an outdoor public space where ten or more people are gathered," subject to certain exceptions. *Ex. A 67-71.*

53. Plaintiff Case has difficulty breathing while she wears a mask to the point where she believes she cannot wear one. *See Aff. of Jennifer Case, Ex. F.*

54. The mask order provides an exception for "any person with a medical condition or disability that prevents him or her from wearing a facial covering." *Ex. A 70.*

55. Plaintiff Case has difficulty breathing while she wears a mask, but because the order does not define "medical condition," it is unclear whether this exemption applies to her or not.

56. Consequently, the order presents her with a Hobson's choice of either wearing the mask and risking asphyxiation or breathing freely while risking criminal prosecution.

57. The mask order further provides an exception for "[a]ny person who cannot wear a facial covering because he or she is actively providing or obtaining access to religious worship, though wearing a face covering is strongly encouraged." Exh A 71.

58. The order does not define what "obtaining access to religious worship" means. Does this mean, for instance, that Case may remove her mask while she sings but must put it back on while she listens to her pastor preach a sermon? Would this necessarily mean that singing is worship but listening to the Word of God is not? If so, would the government violate the Religion Clauses of the First Amendment by making that determination?

59. The mask order has not provided fair warning to Case and others like her who seek access to religious worship, which in turn has caused the chilling effect on First Amendment activity of which Case complains herein.

60. Face masks are required when a person is within 6 feet of another person in following places: indoor space open to general public, a public transport vehicle, or outdoor space where 10 or more are gathered. *Ex. A 70*. Is a privately-owned taxicab that serves the general public considered a public transport vehicle? In indoor space open to the general public, or outdoor space where ten or more are gathered, who is liable for violations? The owner? The person who is not wearing a mask? Everyone present? What if one of those persons removes her mask and refuses the owner's request that she put it back on?

61. For all of these reasons, the mask order is unconstitutionally vague.

62. As will be shown in Count VII *infra*, Governor Ivey and Dr. Harris have no authority to deprive the Plaintiffs of their liberties secured by the United States Constitution.

63. Moreover, the executive branch's arbitrary actions of requiring every person in Alabama to wear a mask in public as described in Defendants' Orders of July 15, *Ex. A 67-79*, rise to the level of "shocking the conscience," thus violating the substantive due process right against arbitrary government action. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017). Further,

exempting "indoor space not open to the general public" from wearing masks allows government officials like the Defendants herein to violate rules, regulations, mandates, and orders to which others are subject without any reason, and free of any penalty to which others are subject.

64. Plaintiff Callahan drives a school bus for the Public Schools. On the one hand, the vehicle she drives provides public transportation. On the other hand, it is not "operated by transportation service," but a public school system. She is therefore unclear whether the mask order applies to her.

65. The mask order requires every person to wear a mask when within six feet of another. *Ex. A 70-71*. The arbitrariness of this rule has harmed plaintiffs who might remove their mask when alone but must put their masks back on every time someone comes within six feet of them.

66. The requirement of wearing masks is arbitrary in and of itself. If the government can force its citizens to wear a mask, then there is no reason to believe it could not also require them to wear gloves, biohazard suits, or an inflatable bubble.

67. Defendants have therefore subjected Plaintiffs to vague and arbitrary commands in violation of the Due Process Clause of the Fourteenth Amendment.

68. There are numerous studies which show that masks, particularly cloth masks, are ineffective and may even increase the likelihood of disease. (*Surgeon General: Data doesn't back up wearing masks in public amid coronavirus pandemic.* Talia Kaplan, Fox News: March 31, 2020; *Facemasks Won't Protect from Coronavirus Says CDC and WHO*, Olivia Rondean, Daily Caller, March 3, 2020. https://dailycaller.com.)

## C.    Governor Ivey's Proclamations

69. Some of Governor Ivey's proclamations have been equally arbitrary.

70. On May 8, 2020, the Governor issued a proclamation renewing the state of emergency for another 60 days.  Exh 33.2

71. In doing so, Governor Ivey relied on the Alabama Emergency Management Act of 1955 ("the AEMA") to justify her authority to renew the state of emergency. *Id.* (§ 31-9-8 (a), Ala. Code 1975)

72. As will be explained *infra* in Count VII, the Alabama Emergency Management Act cannot delegate legislative power to the Governor and thereby violates the Alabama Constitution.

73. The AEMA authorizes the Governor to declare a state of emergency for 60 days.

74. At the end of those 60 days, the AEMA allows the state of emergency to be extended if (1) the Governor issues a new proclamation renewing the state of emergency, or (2) the Legislature declares a state of emergency.

75. The AEMA does not give the Governor any intelligible principles by which she may discern whether to extend the state of emergency or not.

76. Thus, the AEMA leaves the matter of whether to extend the state of emergency *completely to the will* of the executive branch. In other words, the decision of whether to extend the state of emergency or not is completely arbitrary.

77. On June 30, 2020, Governor Ivey issued another proclamation that seemed to acknowledge that Dr. Harris's authority to issue orders had expired, and therefore she adopted his orders as her own. *Ex. A 53.*

78. Consequently, when Dr. Harris issued his mask orders on July 15 and July 29, Governor Ivey issued proclamations ordering every person in Alabama to obey Dr. Harris's orders pursuant to her authority under the AEMA.

79. Thus, Governor's proclamations forcing everyone to obey Dr. Harris's orders are based on an unconstitutional exercise of arbitrary power.

## D. Dr. Harris's Orders

80. Dr. Harris has routinely required people to keep a 6-foot distance from each other. *See, e.g., Ex. A 72* (prohibiting all "non-related work gatherings of any size that cannot maintain a consistent six-foot distance between persons), Exh A at 50 (allowing restaurants to offer take-out or delivery only if they can constantly maintain a six-foot distance between persons), *Ex. A 25* (allowing outdoor activity only if there is a constant six-foot distance between persons). Dr. Harris did not explain why he ordered people to stay six feet apart instead of four, five, seven, or ten feet. This decision is arbitrary on its face.

81. Dr. Harris's orders have arbitrarily classified "essential" and "nonessential" operations. For instance, on March 27, 2020, Dr. Harris ordered certain businesses to close, classifying them as "non-essential." *Ex. A 19*. These businesses included: "clothing stores," *id.,* despite the indisputable fact that clothing is among the most basic of human needs; "Department stores," *id.,* despite the fact that many of these stores sold items that all reasonable people would consider "essential;" and "massage-therapy establishments and massage services," *id.,* despite the fact that many people rely on these services for the relief of chronic pain.

82. The March 27 order did not give churches the liberty to remain open as the other "essential" businesses. The Bible speaks of the need for Christians to continue meeting together for the sake of ensuring that their souls are saved. *See Hebrews* 10:24-25 and surrounding verses. The Plaintiff pastors would certainly consider the salvation of their parishioners' souls just as "essential," if not more so, than their physical needs. But in contrast, Dr. Harris's order appears to consider only physical needs to be "essential" while spiritual needs to be "nonessential."

83. Dr. Harris's orders have, at times, picked "winners and losers" among economic competitors. For instance, on March 27, Dr. Harris ordered the following retail stores to close:
   (1) Furniture and home-furnishings stores
   (2) Clothing, shoe, and clothing-accessory stores
   (3) Jewelry, luggage, and leather goods stores
   (4) Department stores
   (5) Sporting goods stores

(6) Book, craft, and music stores

*Ex. A 19.* Nearly all of the goods sold in the stores listed above were also sold by larger businesses, including Wal-Mart, Target, Home Depot, Lowes, and, perhaps most notably, Amazon, which were allowed to remain open. The result of this order was to shut down Alabama's small businesses while driving their customers to their large-retail competitors.

84. On April 3, 2020, Dr. Harris issued a "Stay at Home Order," which allowed churches to meet but only if (1) less than 10 people were in the building, or (2) the church held "drive-in" services. *Ex. A 23-25.*

85. This same order allowed people to go to "essential retailers" and set foot in the stores themselves as long as the occupancy of the store was "no more than 50 percent of the normal occupancy load as determined by the fire marshal." *Ex. A 30.*

86. Dr. Harris gave no explanation for why churches could not meet under the same conditions as the other "essential retailers." *Cf. Maryville Baptist Church v. Beshear*, No. 20-5427 (6th Cir. May 2, 2020) (declaring unconstitutional an order that banned church meetings but not laundromats, accounting services, law firms, hardware stores, or similar services).

87. Dr. Harris's decision to discriminate against churches was arbitrary.

88. Plaintiff Case was denied the opportunity to go to church during this period and is entitled to damages for the arbitrary violation of her constitutional rights.

89. The Plaintiff pastors were also denied the opportunity to preach the Word of God to their congregation in person according to their religious convictions.

## COUNT II – VIOLATION OF THE FIRST AMENDMENT ESTABLISHMENT CLAUSE

90. Plaintiffs reiterate and adopt each and every allegation in the preceding paragraphs 1 through 89.

91. The First Amendment has been held to be applicable to the States by and through the Fourteenth Amendment to the United States Constitution.

92. Certain proclamations, orders, and directives issued by both Governor Ivey and State Health Officer Scott Harris have unlawfully and in direct contradiction to the Establishment Clause of the First Amendment to the United States Constitution restricted and/or effectively prohibited worship services by restricting such services to "fewer than 10 people and the people maintain a consistent six foot distance from one another." *Ex. A 24* (Amendment Order, April 3, 2020, p. 2) extended by order of Governor Ivey June 30, 2020 *Ex. 53* or "the event is a (drive-in) worship service that adheres to the following rules:

    a. All participants shall remain in their vehicles for the entirety of the service:

    b. The participants in each vehicle all share the same place of residence: and

    c. Participants do not come within 6 feet of participants in other vehicles." (*Id. Ex. A 25* also extended by Governor Ivey *Id.*)

93. Plaintiff Case, like many Alabamians, was denied her right to worship as she has long done because her church closed its doors following the Governor's orders.

94. The First Amendment creates a wall of separation between church and state which, according to Justice Hugo Black in *Everson v. Board of Education,* 330 U.S. 1,15 (1947), "must be kept high and impregnable. We could not approve the slightest breach." In that case, the Court went on to state that if the *Establishment Clause* meant anything, it stands for the proposition that government may not "force [or] influence a person to go to or remain away from church against his will." *Id.* Restriction of assembly to ten persons in a church is clear interference with the institution of the church.

95. The chief architect of the Constitution and one of the proponents of the First Amendment, James Madison, stated in his Memorial and Remonstrance that, "We maintain that in matters of religion no man's right is abridged by the institution of civil society and that religion is wholly exempt from its cognizance." (attached to *Everson* 330 U.S. 1,18 (1947)) That is the very essence of the 1st Amendment; that government cannot dictate to the church how they should worship the Creator God.

96. Plaintiffs Nelson and Liddle as well as every member of the congregations they represent have all been grievously injured by the actions of the Defendants and feel strongly that if there is a risk to the health and welfare of church attendees, it is for the church, not the state, to determine that issue.

97. Pastor Liddle even advised the Governor by written correspondence on the occasion of such restrictions that, "The work of the church is essential; and one if its essential functions is the gathering of its people together before the Lord which we are commanded by Him not to neglect." *Aff. of Pastor Mark Liddle, Ex. H.*

98. Many of Governor Ivey's Orders and those of Dr. Scott Harris include "Guidelines for Places of Worship," *Ex. D,* which identify "minimum recommended practices" informing churches how they should operate during the pandemic.

99. When the state presumes to debate or even provide "guidelines" on how worship should be performed or prayers should be given, an Establishment Clause violation will occur! In the case of *Lee v. Weisman,* 505 U.S. 577 (1992), the U.S. Supreme Court held that a Jewish prayer spoken by a rabbi at a middle-school graduation violated the Establishment Clause. The Court noted that the principal had chosen the rabbi to lead in prayer and stated further at p. 588,

"The State's role did not end with the decision to include a prayer and with the choice of clergyman. Principal Lee provided Rabbi Gutterman with a copy of the *"Guidelines for Civi Occasions"* and advised him that his prayers should be nonsectarian. Through these means, the principal directed and controlled the content of the prayer. Even if the only sanction for ignoring the instructions were that the rabbi would not be invited back, we think no religious representative who valued his or her continued reputation and effectiveness in the community would incur the State's displeasure in this regard.

## COUNT III– VIOLATION OF THE FIRST AMENDMENT
## FREE EXERCISE CLAUSE

100. Plaintiffs reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 99.

101. The First Amendment has been held to be applicable to the States by and through the Fourteenth Amendment to the United States Constitution.

102. The provision of paragraph 91 above demonstrates Defendants' arbitrary restriction on church attendees. By that same order made effective on April 4, 2020, the Defendants allowed all "essential retailers" as defined in paragraph 2 of the order, to include "grocery stores, pharmacies, big box stores," as well as *liquor stores*, bookstores, hardware stores, office supply stores, computer stores, etc to operate at "50 percent of the normal occupancy" as determined by the fire marshal Exh A 30. The Defendants' logic and reasoning is not only contradictory and confusing, but also arbitrary, vague, subjective, discriminatory, and an unconstitutional infringement of religious liberty provisions of the First Amendment to the United States Constitution.

103. "Closing of nursing homes, hospitals, and assisted living facilities to all visitors… and non-essential health care personnel" (*Ex. A 32*) deprives Plaintiffs Nelson and Liddle of their right, in accordance to their faith, to provide prayer and loving care to the sick, elderly, and distraught of society. *(See Aff. of Jim Nelson, Ex. I, para. 9, Aff. Mark Liddle, Ex. H, para. 7-8)* Plaintiffs Case, Nelson, and Liddle believe that God is sovereign and in ultimate control of our lives whether in sickness or health.

104. In his Bill for Religious Freedom in 1786, Thomas Jefferson clearly explained separate jurisdictions of Church and State, when he wrote,
    "That to suffer (allow) the civil magistrate to intrude his powers into the field of opinion and restrain the profession or propagation of principles on supposition of their ill tendency is a dangerous fallacy which at once destroys *all religious liberty*… that it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt outs against peace and good order." (Emphasis added) The U.S. Supreme Court in *Reynolds v. US*, 98 U.S. 145,163 (1879) recited

those sentences concluding that, "In these two sentences lies the true distinction between what properly belongs to the church and what to the state."

105.   Plaintiffs Case, Nelson, and Liddle maintain that the Governor's Orders and those of State Health Officer Scott Harris are a direct and flagrant abuse of civil authority, and intruding their power into the authority of the church and restraining assembly and worship on supposition of their ill tendency is a dangerous fallacy indeed! Certainly the churches have not threatened the peace and good order of society. Therefore, the State of Alabama by and through its governor and state health officer have deprived the Plaintiffs of their religious liberty.

106.   These concepts are not novel, nor are they antiquated. As late as 1990, in the case of *Employment Division of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990), Justice Blackmun, joined by Justice Brennan and Justice Marshall, stated in a dissent,
         "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them on legal principles to be applied by the courts. One's right to life, liberty, and prosperity, to free speech, a free press, *freedom of worship and assembly,* and other fundamental rights may not be submitted to vote; they depend on the outcome of no election."
         The majority opinion in that case agreed with the dissent with regard to worship and assembly. Justice Scalia and a majority of the Court in that case stated, "But the 'exercise of religion' often involves not only belief and profession, but the performance (or abstention from) physical acts *assembling with others for a worship service,* participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation. *It would be true, we think though no case of ours has involved the point, that a State would be 'prohibiting the free exercise of [religion]'" if it sought to ban such acts of abstentions only when they are engaged in for religious reasons,* or only because of the religious beliefs that they display." *Smith,* 494 U.S. at 879 (emphasis added).

107.   Likewise, it is no part of the business of government to provide "guidelines" on how worship is to be conducted in a church, how far apart members must sit from each other, whether masks are to be worn, the

18

maximum number who may attend, or whether members in a drive-in service must only be from the same family, or remain in their car during the service. *Ex. A 24-25*.

108. The Church Assembly in an institution ordained by God for His worship, praise, instruction, and communion of the saints, and is exempt from laws, regulations, mandates, directives, ordinances, proclamations, and guidelines of state government concerning modes of worship and articles of faith. There is no authority of the state to issue directives or even guidelines regarding masks, social distancing, family separation, size of gatherings, drive in assemblies, distance between pews such as in *Ex. D*, Guidelines for Places of Worship, that such decisions by church bodies is entirely voluntary and not under any control of the state.

## COUNT IV– VIOLATION OF THE FIRST AMENDMENT FREEDOM OF ASSEMBLY

109. Plaintiffs reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 108.

110. The First Amendment has been held to be applicable to the States by and through the Fourteenth Amendment to the United States Constitution.

111. The First Amendment Freedom of Assembly Clause, incorporated and made applicable to state and local governmental action by the Fourteenth Amendment to the United States Constitution states that the government may not abridge "the right of the people to peaceably assemble, and to petition the Government for a redress of grievances."

112. The "right to peaceably assemble" and the "right to petition the Government for a redress of grievances" are two seperate rights as shown by the comma between.

113. Actions of the Defendants have deprived virtually every citizen of the State of Alabama of one of their most valuable constitutional rights, the right to assemble.

114. All plaintiffs in this case maintain that their right to assemble was restricted as of March 28, 2020 by orders of the Defendant State Health Officer Scott Harris by order stating,
"Effective March 28, 2020 at 5:00 PM, all non-work related gatherings of 10 persons or more, or non-work related gatherings of any size that cannot maintain a consistent six-foot distance between persons are prohibited." *Ex. A 18-19.*

115. On April 3, 2020 the State Health Officer Scott Harris issued an order to all people in the State of Alabama to remain at "his or her place of residence except as necessary to perform any of the following exceptional activities,... to attend **religious** services... if... the event involves fewer than 10 people and the people maintain a consistent six-foot distance from one another, or the event is a 'drive-in' worship service that adheres to the following rules:
   a. All participants shall remain in their vehicles for the entirety of the service;
   b. The participants in each vehicle all share the same place of residence; and
   c. Participants do not come within six feet of participants in another vehicle."

116. Plaintiffs Case, Nelson, and Liddle maintain that their faith requires of them not to forsake the "assembly of ourselves together...," Hebrews 10:25, and to praise and give God "...thanks in the great congregation...praise there among much people." Psalm 35:18.

117. Defendants actions have violated Plaintiffs' constitutional rights to assemble in congregational worship in a manner which their faith requires.

## COUNT V– VIOLATION OF THE FIFTH AMENDMENT DUE PROCESS CLAUSE/LIBERTY

118. Plaintiffs reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 117.

119. The Fourteenth Amendment to the United States Constitution adopts the language of the Fifth Amendment, making it applicable to the states, "[N]or

shall any state deprive any person of life, liberty, or property, without due process of law." *U.S. Const. Amend. XIV, § 1.*

120. The right to work for a living is a basic liberty and, "[i]t requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich,* 239 U.S. 33, 41 (1915).

121. In 1901, when the Alabama Constitution was drafted and ratified, economic liberties such as the liberty to contract, the right to enforce a contract, the right to own and to use property, and the right to enter into and to practice the common occupations were highly valued. *Allgeyer v. Louisiana,* 165 U.S. 578, 17 S.C. 427, 41 L. Ed. 832 (1897) and *Lochner v. New York,* 198 U.S. 45, 25 S.C. 539 (1905) upheld economic rights under the concept of liberty of contract guaranteed in the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The United States Supreme Court has never denied that the liberty to contract is a constitutionally protected right.

122. The framers of the Alabama Constitution of 1901 protected economic liberties under the Due Process Clause of Article 1, Section 6 in language similar to that of the Fifth and Fourteenth Amendments to the Constitution of the United States.

123. Plaintiffs Scott Farr and Bruce Ervin have been denied their right to work and to make a living for themselves and their families as a result of the Defendants' action in closing their business. *Ex. A 15-22*

124. The freedom of locomotion and intrastate travel and to remove from one state to another according to one's election is an attribute of personal liberty. As early as 1900, the United States Supreme Court recognized such a right secured by the Fourteenth Amendment. *Williams v. Fears,* 179 U.S. 270, 274 (1900).

125. Our Courts have long recognized that even beyond the right to travel, there is a fundamental right to simply be out and about in public. *City of Chicago v. Morale,* 527 U.S. 41, 53-54 (1999) (striking down an anti loitering ordinance aimed at combating street gangs and observing that "the

freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment."). *See also Papachristou v. Jacksonville,* 405. U.S. 156, 164-65 (1972) (citing a Walt Whitman poem in extolling the fundamental right to loiter, wander, walk, or saunter about the community); *Bykofsly v. Borough of Middletown,* 429 U.S. 964 (1976) (Marshall, J., dissenting) ("The freedom to leave one's house and move about at will is of the very essence of a scheme of ordered liberty,... and hence is protected against state intrusions by the Due Process Clause of the Fourteenth Amendment.") (internal citation and quotation marks omitted)

126. The power of the state to quarantine an individual is restricted to the necessity of the public health, and must be accompanied by procedural due process, including notice, hearing, right to counsel and the burden of proof rests with the State, see Wendy E. Parmet, Quarantining the Law of Quarantine, why quarantine law does not reflect contemporary Constitutional Law. 9 Wake Forest JL poly' 1,4 (2018)

127. The orders of Governor Ivey and State Health Official Scott Harris confining virtually every citizen of Alabama to their home contradicts logic, reason, and our law.

128. Defendants' Stay at Home Orders *Ex. A 23-33* are in effect "quarantine orders" of healthy people not shown to have a disease or illness and are a violation of the Fourteenth Amendment to the United States Constitution, as well as a contradiction to our historic quarantine laws.

129. Such draconian laws have never been imposed in our country prior to the present COVID-19 epidemic or in response to even more serious epidemics in history.

130. These unprecedented orders appear to have originated in Wuhan, China and in other areas of China where civil liberties and constitutional guarantees of freedom do not exist.

131. Every Plaintiff in this case as well as the citizens of Alabama have suffered because of the unconstitutional edicts of the Governor and State Health Officer under the pretext of an emergency.

132. The Supreme Court has held, and we believe in error, that the Constitution protects certain liberty interests that are not found in the Constitution itself. *See, e.g., Griswold v. Connecticut,* 381 U.S. 479 (1965) (to right of privacy for married couples to use contraceptives); *Roe v. Wade,* 410 U.S. 113 (1973) (right of privacy to abort an unborn child); *Lawrence v. Texas,* 539 U.S. 558 (2003) (liberty interest in engaging in homosexual conduct).

133. Both the United States Supreme Court and the Eleventh Circuit have applied reasoning like this to matters of personal clothing and appearance *See, e.g., Kelley v. Johnson,* 425 U.S. 238 (1976) (liberty interest in matters of personal appearance protected by the Fourteenth Amendment); *DeWeese v. Town of Palm Beach,* 812 F2d 1365 (11th Cir. 1987) (overturning ordinance requiring male joggers to wear shirts).

134. At the very least, in today's political climate, the decision to wear a mask is a personal decision which involves freedom of speech and expression, especially when wearing a mask could be perceived as supporting the mask orders while refusing to wear one could be perceived as a statement of dissent.

135. Plaintiff Jennifer Case believes that wearing a mask violates not only her liberty interests, but her religious beliefs as well. Causing her children to wear a mask violates her beliefs as a mother and parent of 2 children. Therefore invading that jurisdiction of parental authority for the care, nurture, safety, and health of one's children. *See Aff., Ex. F, and sworn statement of Jennifer Case, Ex. F (i).*

136. If the Fourteenth Amendment protects liberties that are supposedly personal such as the right to abort a child or engage in sexual activity (both of which we disagree), then surely it protects liberties that are even more personal: the liberty to choose how to present one's face and the liberty to choose whether to wear a covering that could impede the flow of *oxygen* to one's body.

137. Orders requiring people to wear a facial covering or submit to quarantine without any sign of illness or disease violates basic liberty interests.

## COUNT VI- VIOLATION OF THE FIFTH AMENDMENT
## DUE PROCESS CLAUSE/PROPERTY

138. Plaintiffs reiterate and adopt each and every allegation in the preceding paragraphs 1 through 137.

139. The Fourteenth Amendment to the United States Constitution adopts the language of the Fifth Amendment, making it applicable to the states.

140. The Fifth Amendment to the United States Constitution provides in part that "...nor shall any person...be deprived of life, liberty, or *property* without due process of law..." (Emphasis added)

141. Under § 31-9-2 (a) of the Code of Alabama, Alabama Emergency Management Act, "Findings and declarations of necessity; Purpose of Article and Public Policy," it is the purpose of the Act "...to preserve the lives and *property* of the people of this state." (Emphasis added)

142. As explained in preceding paragraphs, both plaintiffs Dr. R.S. Porter and Scott Farr have suffered a loss of personal and/or use of real property without due process of law. *See Aff. of R.S. Porter, Ex. J, Scott Farr, Ex. K, and Bruce Erwin, Ex L*

143. On March 27, 2020, State Health Officer Scott Harris ordered all "non essential" businesses closed to non-employees. *Ex. A 19.* This order effectively closed Plaintiffs Farr and Ervin's business, the Male Room. *See Aff. of Scott Farr, Ex. K, and Aff. of Bruce Ervin, Ex L.*

144. Plaintiff Dr. R.S. Porter's business Functional Chiropractic was adversely affected and Plaintiff suffered damages when requirements of social distancing, facial coverings (masks), and emergency maximum occupancy rates of 50%, caused patients and clientele to discontinue services. *See Aff. of Dr. R.S. Porter, Ex. J.*

145. By prohibiting Plaintiffs Porter, Farr, and Ervin from virtually all economically viable use of their places of business, allegedly for the purpose of preventing the spread of COVID-19, Defendants have effectively taken Plaintiffs' property for public use without just compensation in violation of the Fifth Amendment to the United States Constitution and Section 23 of the

Alabama Constitution. See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992).

## COUNT VII– *ULTRA VIRES*
## GOV. IVEY'S PROCLAMATIONS

146. Plaintiffs reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 145.

147. Article III, § 42 of the Alabama Constitution of 1901 provides:
    a. The powers of the government of the State of Alabama are legislative, executive, and judicial.
    b. The government of the State of Alabama shall be divided into three distinct branches: legislative, executive, and judicial.
    c. To the end that the government of the State of Alabama may be a government of laws and not of individuals, and except as expressly directed or permitted in this constitution, the legislative branch may not exercise the executive or judicial power, the executive branch may not exercise the legislative or judicial power, and the judicial branch may not exercise the legislative or executive power.

148. Thus, even if the legislature wanted the Governor to exercise *legislative power* even under the emergency circumstances, it could not do so without violating the Alabama Constitution.

149. James Madison, drawing on Montesquieu, explained the importance of separating the legislative and executive powers in Federalist 47: "The reasons on which Montesquieu grounds his maxim are further demonstration of his meaning. 'When the legislative and executive powers are united in the same person or body,' says he, 'there can be no liberty, because apprehensions may arise lest THE SAME monarch or senate should ENACT tyrannical laws to EXECUTE them in tyrannical manner...'"

150. The Alabama Supreme Court has repeatedly affirmed the principle that the Legislature cannot give the executive branch power. *See, e.g., Monroe v. Harco, Inc.*, 762 So. 2d 828, 831 (Ala. 2000) ("The legislature cannot delegate its power to make a law") (citations, alterations, and quotation marks omitted); *Folsom v. Wynn*, 631 So. 2d 890, 894 (Ala. 1993) ("It is settled law that the Legislature may not constitutionally delegate its powers,

whether the general power to make law or the powers encompassed within that general power"); *Cagle v. Qualified Electors of Winston,* 470 So. 2d 1208 (Ala. 1985) ("the power vested in the legislature to make laws cannot be delegated").

151. The Alabama Supreme Court has recognized the following test to distinguish between the executive branch exercising legislative power and the executive branch merely administering the law as it stands:

> The true test and distinction whether a power is strictly legislative, or whether it is administrative, and merely relates to the execution of the statute law, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution to be exercised under and in pursuance of the law. The first cannot be done. To the latter, no valid objection can be made. *Monroe,* 762 So. 2d at 828 (citations and quotation marks omitted).

> The Legislature of Alabama has no authority to usurp rights secured by the First, Fifth, and Fourteenth Amendments to the United States Constitution and the Constitution of Alabama, nor can Governor Ivey or State Health Officer Scott Harris claim such power which the Alabama Legislature has no right to give.

152. In issuing her proclamations, Governor Ivey has relied on the Alabama Emergency Management Act of 1955, Ala. Code 1975 §§ 31-9-1 *et seq.*

153. Governor Ivey's proclamations requiring Plaintiffs to wear a mask, restricting assembly, closing businesses, and effectively closing churches are nothing but the exercise of legislative power.

154. This exercise of legislative power violates the Alabama Constitution.

155. Governor Ivey's proclamations have been issued *ultra vires* and therefore are null and void as applied to Plaintiffs.

## DR. HARRIS'S ORDERS

156. Plaintiffs reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 155.

157. Dr. Harris has repeatedly cited § 22-2-2, Ala. Code 1975, as the authority upon which he relies to promulgate his mask orders. *Ex. E*

158. However, nothing in this section authorizes Dr. Harris to promulgate a rule requiring every person in Alabama to wear a mask, socially distance, stay at home, close their business, restrict assembly, or give up their constitutional rights. Even the Alabama Legislature can't do that! Nor can the Alabama Legislature give to the State Health Officer an authority which it does not have to give.

159. Consequently, Dr. Harris issued this order *ultra vires,* and it is null and void as applied to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgement as follows:

A. That this Court enter an injunction prohibiting Defendants from enforcing the orders, proclamations, directives, mandates, regulations, etc with regard to wearing of masks, unconstitutional regulation of houses of worship, discriminatory closing of businesses, social distancing, assembly, and stay at home orders;

B. That this Court award Plaintiffs nominal and compensatory damages for past injuries;

C. That this Court award Plaintiffs reasonable attorney fees pursuant to 42 U.S.C. § 1988, and as otherwise provided by the law; and

D. That this Court grant such other and further relief as this Court deems equitable and just under the circumstances.
Dated this 24 day of September, 2020.


/s/ Roy S. Moore

Roy S. Moore ABA #6532R53R                 Melissa Isaak ABA #ASB4872A591
*Counsel of Record*                                        *Co-Counsel*
*Lead Counsel, Attorney for Plaintiffs*     Isaak Law Firm
Foundation for Moral Law                       2815 B Zelda Road
1 Dexter Ave.                                            Montgomery, Alabama 36106
Montgomery, Alabama 36104
kayla@morallaw.org